NOTICE

Decision filed 12/12/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200284-U

NO. 5-20-0284

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Bond County. |
| | ) | |
| v. | ) | No. 18-CF-150 |
| | ) | |
| JAMES ANDREW HICKMAN, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice Welch concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the defendant's conviction and sentence for first degree murder because the evidence adduced at his bench trial was sufficient to sustain his conviction beyond a reasonable doubt, and because there was no reversible error in the State's closing argument during the bench trial.

¶ 2    The defendant, James Andrew Hickman, appeals his conviction and sentence, following a bench trial in the circuit court of Bond County, for first degree murder. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Because both of the issues raised by the defendant in this direct appeal arise from the evidence and argument presented at his bench trial, we focus primarily on that procceding, although we provide other background information as needed for appropriate context. We provide

1

only those facts necessary to our disposition of the defendant's two arguments on appeal. On November 20, 2018, the defendant was charged, by information, with two counts of first degree murder. On March 12, 2020, the defendant, by counsel, filed a waiver of jury trial and request for bench trial. On March 26, 2020, a two-count first amended information was filed. The first amended information alleged, in each count, that on or about November 16, 2018, the defendant "without lawful justification, shook or struck E.A.R.H.," whose date of birth was September 15, 2018. Count I alleged that the defendant committed this act "knowing that such act created a strong probability of" E.A.R.H.'s death, and that the act did in fact cause his death. Count II alleged that the defendant committed the act "knowing that such act created a strong probability of great bodily harm to E.A.R.H.," and that the act caused his death. We note that in his opening brief on appeal, the defendant refers to E.A.R.H.—who was the son of the defendant—by his first name, Evander. We will refer to him as Evander as well.

¶ 5        Also on March 26, 2020, the defendant and his counsel signed a waiver of the defendant's right to a trial by jury. The trial judge also signed the waiver, attesting that the defendant had appeared in person, at which time he was apprised of his rights and persisted in his waiver of his right to a trial by jury, which led the trial judge to conclude that the waiver was "voluntarily made with full knowledge of the defendant's rights." The case proceeded to a bench trial that began on July 27, 2020, and that encompassed both counts found in the first amended information.

¶ 6        The first witness to testify at the defendant's bench trial was Morgan Campbell. She testified that she was born in November 1998, and that at the time of the trial she was 21 years old. She testified that she met the defendant when she was 17 years old, and began a romantic relationship with him in July 2017. She testified that in February 2018, she and the defendant lived together at a secluded trailer park, where they had "a disagreement about finances" that "escalated" and resulted in the defendant using his fist and a hammer to "put holes in the wall" of the trailer.

2

Morgan testified that thereafter, as the disagreement continued, the defendant grabbed her by her shirt and said, *inter alia*, "fuck you, fuck that baby, I don't want that baby." She testified that she was pregnant at the time, that she left the defendant for "[f]our or five days maybe," and that when she returned to the trailer it was in a state of "disarray," with clothes and furniture scattered about and the holes still in the walls. She testified that eventually she moved back in with the defendant, and that there were no more "incidents" prior to the birth of their child, Evander. She later testified that the defendant broke his hand during the February wall-punching incident.

¶ 7 Morgan testified that when Evander was born, the defendant was present at the hospital and was the first person to hold Evander. She testified that Evander was healthy, with no medical concerns about him at the hospital. She testified about how she took care of Evander during his two months of life. She testified that when she left the hospital and returned to living with the defendant, things were "okay." She testified that other than the night at issue in this case, the longest she left Evander alone with the defendant was two hours, and usually it was for shorter periods of time. She testified that the defendant never hit her, and that she never saw the defendant hit Evander.

¶ 8 Morgan testified, however, that there were times Evander "showed up with *** injuries." She testified that "at the end of October," she went to have dinner with a friend, and that the defendant texted her and told her she needed to return home because a lotion bottle had fallen on Evander's face after Evander's bath and Evander had "a fat lip or a black eye, one of those two." She testified that when she got home and saw Evander, she observed that "[h]is lip was swollen, like a little fat, and it was really—it was like puffy and red." She added that Evander "had like a little bit of a bruise right under his eye," but testified that the inuries were not "terrible," and began to clear up by the next day. Morgan testified that she took photographs of the injuries to send to her mother because she "was scared" because Evander was still crying when she got home and

saw him. She authenticated the photographs. She acknowledged that Evander "might not have been crying from the incident," and that at that point in time, she had no reason not to believe the defendant's story about what happened.

¶ 9    Morgan testified that on Halloween of 2018, which was approximately one week after the first incident, another incident occurred. She testified that when she returned after leaving Evander with the defendant for approximately two hours, Evander "had bruising on his butt." She testified that at first she thought Evander had blue dye on his butt from his diaper, but after having a conversation with her mom, and Googling it—and after the bruise turned from blue to green "a couple days later"—she realized that it was a bruise. She authenticated a photograph she took of the bruise. She testified that when she asked the defendant what happened to Evander, the defendant "didn't really give [her] an answer." She showed the bruise to several people, including at the hospital where her mother worked.

¶ 10    Morgan testified that at this point, she and the defendant lived in a duplex, and that the defendant put a hole in a wall at the duplex too, following an argument between her and the defendant. She testified that they decided to separate, and that she moved to another residence a few days before the incident in question in this case. She testified that on that Thursday, before she dropped Evander off with the defendant, Evander was "[h]appy, healthy, [and] fed," and that no one had struck Evander or caused any injuries to him. She testified that earlier that day, she took pictures of Evander, because he was exactly two months old that day. She authenticated some of the photograhs and agreed that Evander looked healthy and happy in them. She testified that as she prepared Evander to take him to the defendant, Evander did not have any bruises, cuts, scrapes, bumps, or other marks on his body. She also authenticated photographs of the outside and inside of the duplex where she left Evander with the defendant. When shown photographs that contained

what counsel for the State described as "red spots" on pillows and other belongings in the bedroom, she testified that she did not see the spots when she was at the residence.

¶ 11    Morgan testified that she left Evander with the defendant at the duplex at approximately 5 p.m., and ultimately visited some friends. She authenticated text messages from the defendant that she received on her cell phone during that time, including a message at approximately 6:02 p.m. in which the defendant wrote, "don't freak out but I was drying him off after his bath and he kicked my stomach and pushed himself off my lap and I had to catch him. He's got a red mark on his stomach from me catching him." The defendant texted her a photograph that showed the red mark. Morgan testified that Evander did not have the mark on him when she left him with the defendant approximately one hour prior to that. She testified that she did not think much of the incident at that time, and agreed with the defendant, via a text message, that Evander was kicking more than he previously did. She testified that there were additional text exchanges about their relationship, with the defendant expressing that he wanted them to stay together as a couple. She testified that at 11:55 p.m., the defendant texted, "your boy is okay, put him to bed with a full belly and a smile, I hope you're doing okay, I love you. Goodnight." She testified that the defendant texted a photograph of Evander. She testified that she did not respond, because she might have been asleep at that time.

¶ 12    Morgan testified that the defendant called her at approximately 4:45 a.m.,[1] which awakened her. She testified that the defendant "was freaking out, saying that Evander was not breathing, and I believe he said he was unconscious, he had done CPR, he told me that he had called 911, and he was waiting for the first responders and paramedics to get there." She added that she did not "remember a whole lot of exactly what he said, but that was the gist of that

_____

[1]She thereafter testified that the call was at approximately 5:15 a.m., which was more consistent with telephone records produced prior to, and at, trial.

5

conversation was him telling me that he wasn't breathing, he was blue, there was blood coming from his mouth—or his nose." She agreed that the call was "a surprise," because Evander had never had any health issues. She spoke to the defendant again as she drove to the hospital, and the defendant told her "over and over again" that the defendant woke up and Evander "wasn't breathing." She testified that "[t]here wasn't a whole of explanation, he didn't know what was going on."

¶ 13    Morgan testified that when she was allowed to see Evander at the hospital, Evander "was in bad shape, but he was—he was still responsive at that time. Like they had got him stabilized and he had a breathing tube and stuff in, but he squeezed my hand, he looked at me, he let out a little cry. He was in bad shape but he was not—he was not unresponsive at that point." Evander was thereafter transported to a different hospital by helicopter, and Morgan, the defendant, and other family members drove together to that hospital. Morgan testified that as they did so, she asked the defendant what happened, and the defendant stated that he did not know, and that he woke up and found that Evander was not breathing. She testified that at some point, the defendant mentioned that there had been "weed" in the house, and that he dumped it in a recycling bin outside, then asked her to ask a friend to retrieve it. She testified that she was more worried about Evander than the weed.

¶ 14    Morgan testified that once they arrived at St. Louis Children's Hospital, a doctor told her that Evander was "pretty bad." She testified that she was thereafter told that Evander "suffered a really bad brain injury," and that when she asked if Evander was "going to make it," she was told "probably not." She testified that Evander died at the hospital after she and the defendant made the decision to remove his breathing tube, which they did after being told that he was going to "die either way." She testified that she traveled home with the defendant, because she wanted to be with him, and that on the way, the defendant's grandparents suggested that she and the defendant

6

leave their cell phones somewhere, and that they should not talk to the police. She testified that she agreed to leave the cell phones, and that when the police later wanted to speak with her, she declined to speak to them. She testified that the defendant was questioned separately at the same time, and that he was not allowed to leave after his questioning.

¶ 15     Morgan testified that she thereafter recovered her cell phone, and thereafter spoke with the defendant at the police station, with two officers present. She testified that the defendant told her "at that time that what had actually happened was he woke up at three in the morning and Evander's hands were cold so he pulled the blanket up like around I'm guessing like his shoulders, and then he fell back asleep and woke up again and the blanket was wrapped around Evander's head." She testified that the defendant told her that when he then "removed the blanket, Evander was blue and he shook him, I guess out of fear, and I believe he said smacked his back and stuff like that." She testified that the defendant had not told her these things previously. She testified that she considered herself to be "on the defendant's side" until the autopsy results came back, at which point she decided she wanted to cooperate with the police. She did not discuss the case with the defendant again after that point.

¶ 16     On cross-examination, Morgan agreed that the February 2018 argument was "a heated argument," and that she made inappropriate remarks during the argument too. She further agreed, with regard to the first incident, that the way things were arranged in the duplex, it was possible that the lotion bottle fell on Evander as the defendant contended that it did. Morgan agreed that because both she and the defendant sold marijuana, she did not object to leaving their phones elsewhere after Evander died, because evidence of their marijuana sales might be found on their phones. She agreed that they sold "small amounts" of marijuana "for people's personal use," and testified that she did not use marijuana. Following Morgan's testimony, the photographs and screen

7

shots of text messages that she authenticated were admitted into evidence, without objection from the defendant.

¶ 17    Sabrina Daniken testified that she was friends with Morgan and the defendant, and that in February 2018, she went to their trailer after receiving a phone call from Morgan. She testified that the inside of the trailer was "destroyed," with "holes in the walls, the furniture was tipped over, the dining room table and chairs were all over the kitchen, the bedroom was just destroyed, like the drawers were dumped out on the floors." She testified that Morgan "was very upset" and left with her. With regard to Evander in general, Sabrina testified that she saw him "at least two times a week" during his short life, and that he was "healthy" and was a "[v]ery happy, playful baby." She testified that she saw a photograph of Evander's eye injury, and saw personally the "marks" on Evander's butt. With regard to November of 2018, she testified that she saw Evander in the days before he was left in the care of the defendant on Thursday, and that when she saw Evander, she did not see any bruises, cuts, scrapes, or anything else "abnormal" about Evander's skin. On cross-examination, Sabrina agreed that Morgan told her that the defendant never hit or abused her, and agreed that she never saw the defendant hit or abuse either Morgan or Evander.

¶ 18    Caleb Daniken testified that he was married to Sabrina Daniken, and was friends with Morgan, but did not know the defendant. He testified that on Thursday, November 15, 2018, Morgan spent the night with he and Sabrina, and that Evander was with Morgan until late that afternoon. Caleb testified that prior to leaving, Evander "was happy, healthy, watching TV with us, smiling," and that Evander had no sign of accidents or trauma at that time.

¶ 19    Jaye Campbell testified that she was Morgan Campbell's mother, and that she worked in the dietary unit of the hospital in Greenville. She testified that in February 2018, Morgan came to stay with her. Jaye testified that Morgan "was a wreck, very upset" and that she was "hyperventilating *** missing a shoe, [and] her hair was all a mess." Jaye testified that she and

Morgan had a good relationship, and that Jaye was present when Evander was born. She described Evander as "[h]appy." With regard to injuries to Evander, she testified that approximately "the week before Halloween 2018," Evander "had marks on his eye" which the next day were "like a bruise." Jaye testified that on Halloween, when she changed Evander's diaper, "he was perfectly fine," but later that day, Morgan videochatted with her and showed her Evander's "bottom," which Jaye testified looked "bruised." She testified that she texted one of her friends who worked at the hospital, and that the next day, Morgan brought Evander to the hospital, where Jaye's friend who worked there, Deann Morgan, looked at the mark. The trial judge sustained an objection to counsel for the State's question as to what Deann Morgan said about the mark.

¶ 20 Jaye testified that she saw Evander on Tuesday, November 13, 2018, when she babysat him most of the day, and at which time "[h]e was perfectly happy, healthy." She testified that the next time she saw Evander was "Friday in the hospital." She testified that she asked Morgan what "he" did to Evander. She testified that she asked the defendant what happened, and that the defendant "just kept saying that he did everything that he could, he did everything that he could, but was vague on what actually happened at the time." She testified that "later on there was a conversation" in which the defendant said that Evander was "gurgling," that the defendant "picked him up, he was blue," and that the defendant reiterated that he "did everything [he] could."

¶ 21 Jaye testified that after Evander was transferred to St. Louis Children's Hospital, a neurosurgeon there told her "that there was extensive swelling in the brain, he was going to go in and try to relieve some of the swelling in the brain, and that he would speak to us afterwards." She testified that thereafter the neurosurgeon returned and "explained to us that there was severe trauma to his brain, and he even stated that he [had] never seen anything like it in his entire career and that he wasn't going to make it pretty much." Jaye testified that the defendant did not ask the doctor any questions about Evander at that time. Following Jaye's initial testimony, the trial judge and

9

the parties discussed scheduling matters, and agreed that some witnesses would be called out of order to accommodate everyone's schedules. Jaye was then recalled to the witness stand for one further question.

¶ 22    Thereafter, Brynn Byrd testified that she was 21 years old and had known Morgan for approximately 10 years. She testified that she lived with Morgan's family for approximately one year when she was 16, and that Morgan was her "best friend." Brynn testified that she was present at the hospital when Evander was born. She described Evander as "a normal baby." She testified that she saw photographs of the mark on Evander's eye, and on his bottom, but did not see either personally. She testified that Morgan stayed with her on Monday, November 12, 2018, and Tuesday, November 13, 2018, and that she saw Evander during that period of time. She described Evander as "[n]ormal, happy, healthy." She testified that when she learned of Evander's injuries and that he was at St. Louis Children's Hospital, she went there as soon as she could leave her place of work. She testified that while she was at the hospital, the defendant stated during a conversation with Brynn and Morgan that he had "got[ten] rid of the marijuana before the ambulance arrived." When asked what she thought of the defendant's statement, Brynn testified, "Just kind of why, like why was that important, I guess." She testified that the defendant told her that he was giving Evander a bath when Evander fell between the defendant's legs. She testified that the defendant said that he caught Evander. She testified that the defendant did not say that Evander hit the floor, and did not act like Evander hit the floor. She subsequently testified that when she saw the photograph of the mark on Evander's bottom, she believed it looked like a bruise from "three fingers" or "a handprint."

¶ 23    Deann Morgan testified that she was a nurse at St. Elizabeth's Hospital in O'Fallon. She testified that she had been a registered nurse for over 30 years. She testified that in the fall of 2018, Jaye was a coworker of hers, and that she knew Morgan as well. Deann testified that she was

10

Morgan's labor and delivery nurse when Evander was born on September 15, 2018. She testified that Evander was "very, very healthy" when born, with "remarkable" scores on the Apgar testing done when babies are born. She testified that she saw Evander again approximately six weeks after his birth, when Jaye and Morgan brought Evander to the hospital because "there was some concern of a spot on his bottom." She testified that the visit was informal, not a medical checkup. Deann testified that the mark "certainly appeared to be a bruise," but that Jaye and Morgan explained that they had done internet research and also believed the mark could be caused by blue dye from the type of diaper Evander was wearing. On cross-examination, she testified that her opinion was that the mark was "[p]ossibly" a bruise, rather than a dye mark, but agreed that she did not report any suspected abuse to the Illinois Department of Children and Family Services (DCFS), and did not tell Jaye and Morgan to report it to DCFS. She testified that she asked Jaye and Morgan if there were any concerns that the mark was caused by abuse, and that at that time, they indicated that no, they did not have any concerns. On redirect examination, Deann testified that in her opinion, the mark was a bruise. She further testified that she believed that another nurse who was present made a report about the bruise to DCFS, although she later found out that no report had been made, despite the fact that a total of three nurses looked at the mark.

¶ 24　　At the outset of the second day of the bench trial, by agreement of the parties and the trial judge, the defense called its first out-of-order witness, Dr. Joseph M. Scheller of Baltimore, Maryland. Dr. Scheller testified as to his education, training, experience, and publications, and was qualified, without objection from the State, as an expert witness in pediatric neurology. Of relevance to this appeal, Dr. Scheller testified that, after reviewing Evander's medical records, he noted the following significant pieces of information: (1) that at the time of Evander's birth, he was found to have a hematoma—or "a scalp blood clot"—and a blood clot was noted in Evander's autopsy, but no blood clot was noted at either hospital that treated Evander following his injuries,

11

which raised the question of whether it was appropriate to "assume" a clot was "connected with his brain injury," in light of Dr. Scheller's testimony that "the number one cause for any blood clot is a blow, some kind of blow that somebody receives, or a bruise"; (2) a tube placed in Evander's brain at the hospital to measure the pressure in his brain would have caused "a little bit of trauma" when put into place, which led Dr. Scheller to "wonder is there really any evidence at all that in the morning of November 16th when Evander came to initially [the first hospital he was treated at], was there indeed any evidence of a skull or scalp injury, and I didn't find any"; (3) early doctors who treated Evander "did not mention any injury to his head," although "[t]hey did mention some other bruises but did not mention any scalp or skull injury"; (4) "the only mark that they noticed was that he had a line on his abdomen *** a linear line, like, red mark, and that was the only evidence of trauma that they noticed"; (5) later bruises that were noted were probably caused by medical intervention and not present when Evander was first taken to the hospital; and (6) based upon the foregoing, and his review of a CT scan of Evander's body that was taken at St. Louis Children's Hospital, Dr. Scheller did not "believe there is evidence of abusive head trauma." He testified that shaken baby syndrome, the origins of which he described, was an attempt to explain the presence of subdural hematomas when "there was no evidence of impact," and testified that in his opinion, in this case, "we can theorize that maybe Evander was shaken violently, but we don't have proof of it," because the type of physical evidence present in some cases—such as chest marks, broken ribs, or a neck injury—was not present in this one, and because there was no confession from the defendant.

¶ 25 Dr. Scheller testified, in response to a hypothetical in which Evander was found unresponsive by the defendant, that in such a situation, whatever "happened" to Evander must have happened prior to then. Dr. Scheller testified that he noted in his report to the defense that while it was "possible that Evander suffered an accidental or inflicted impact to his head without

12

evidence of scalp and skull injury," nevertheless "if we're claiming that something very, very dramatic happened at 5 a.m. that could—around 5 a.m. that could have ultimately killed Evander, you would like proof of that, and there is no proof of that on the CT scan." Presenting images from the CT scan to the court, Dr. Scheller testified, with regard to those images, that "if someone contends that they have evidence that Evander had some kind of hematoma, blood clot, swelling of the scalp, I would suggest I just don't see that at all. It's just not there." He testified that the CT scan images showed "a number of small subdural and subarachnoid blood clots. We are not seeing any skull injury, and we're not seeing any scalp injury." He testified that "it's 100 percent true that when any doctor, radiologist, neurologist, child abuse specialist, sees an infant who has blood clots on the surface of the brain, the number one cause for that is a traumatic event, and so you're wondering is there evidence of trauma, did Evander get beaten on the head or thrown to the ground, and there is no evidence of that." He added, "I can't say it didn't happen, but I can say there is no evidence that Evander was struck on the head or thrown to the ground." He thereafter reiterated his earlier testimony that there also was no evidence that Evander was shaken.

¶ 26    Dr. Scheller testified that in his report, he suggested two possibilities "as to why might somebody have bleeding on the surface of the brain without trauma," which were (1) complications related to "near miss" sudden infant death syndrome (SIDS), and (2) "one of the less likely scenarios, but definitely a real scenario that we see in pediatrics and certainly see in neurology," which he characterized as when someone "has a problem with bleeding" such as hemophilia, and thus can "get a dramatic blood clot from just a very, very, very minor injury." He testified that Evander had no documented prior history of such a condition, so "it is a theory, it's a hypothesis, that perhaps he was developing some kind of blood clotting abnormality and then that all came to fore the night of the 15th or early morning on the 16th." With regard to the autopsy findings of retinal hemorrhages in both of Evander's eyes, Dr. Scheller testified that this resulted

from the fact that Evander's brain "was terribly swollen." He testified that in his report, he summarized his overall findings by stating that "[i]t is not clear from the medical evidence that Evander was a victim of trauma," and that "[e]ven if he was, there is no way to know if the trauma was accidental or inflicted." He further stated that there was no way to know when such trauma occurred, and reiterated his earlier testimony that it could have happened between 12 and 24 hours prior to the defendant finding Evander unresponsive and calling 911.

¶ 27    Dr. Scheller was asked about his involvement in prior cases involving "a Dr. Case out of the St. Louis region." He testified that he was familiar with her work, including with the "protocol" she had developed that purported to be able to determine with certainty whether a head injury to an infant was accidental or abusive. He testified that he did not believe there was any proper protocol that could make such a distinction "[f]rom anything on an autopsy."

¶ 28    On cross-examination, Dr. Scheller agreed that St. Louis Children's Hospital was "a premier hospital for treatment of children," and testified that he did not take issue with the care given to Evander there. He testified in detail about his past expert testimony as a defense witness in other cases, as well as his publications related to the kinds of issues raised in this case, including a peer review of one of his articles in which the reviewer was very critical of Dr. Scheller's "paucity of data" to support the article. He agreed that there were "an awful lot of times" when he formulated an opinion that there was "a directly contradictory opinion" offered by someone else. He further agreed that the aforementioned peer reviewer wrote that "despite the deficiency/inaccuracy of data and the very unscientific nature of the presentation" in the article, Dr. Scheller made "grandiose conclusions," and that the reviewer wrote that "[i]rresponsible publication like this is as much the fault of journals as it is the author."

¶ 29    Dr. Scheller agreed that he had been barred from testifying in a case in New Mexico in December 2019 because the judge therein found—as the judge's opinion stated—"that Dr.

14

Scheller's testimony is not generally accepted by the scientific community and is not supported by the established scientific research on abusive head trauma." Dr. Scheller testified that he consulted with lawyers he had worked with before, and that they advised him that he did not need to change his methodology in light of the New Mexico case. He therefore agreed that he had not changed his methodology since the December 2019 ruling. He further agreed that in previous lead paint cases in which he had testified as a defense witness "years ago," he "never found that any child had lead poisoning or damage to their brain because of lead paint." He acknowledged that he did not agree with the American Academy of Pediatrics with regard to some of their positions on the diagnosis of abusive head trauma, and agreed that he was part of the minority of 5% of physicians who disagreed with them in a survey on that particular point.

¶ 30     Dr. Scheller testified that he believed child abuse pediatricians in the present case had "jump[ed] to conclusions" about what happened to Evander. He thereafter agreed that a review of Evander's hospital medical records showed that bruises had been noted "on his chest, his abdomen, and his back" early in his stay at the emergency room, which contradicted Dr. Scheller's earlier testimony that no bruises were noted until Evander was seen by a child abuse pediatrician later in the day. He thereafter agreed that "a short fall of a distance of a foot and a half to two feet" would not "cause the traumatic brain injury that Evander had." He agreed that shaking or striking a baby can cause head trauma. He testified that there was a "possibility" that Evander died as a result of blunt head injury, but that he was not certain. He agreed that he would question such a finding by a doctor in this case. He testified that it was "okay" that Dr. Mark Shuman—who was "the other defense doctor" in this case—made that finding, and that they disagreed, because Dr. Scheller "didn't say that I know for sure Evander did not suffer from blunt head injury. I just said that I'm not convinced that he had a blunt head injury." He testified that although he had Evander's medical history, he did not "read the official statements given to the social workers or to the police" in this

case. He testified that there was a "possibility" that Evander's retinal hemorrhages resulted from "inflicted head trauma."

¶ 31 Following Dr. Scheller's testimony, and a lunch break, recordings of the defendant calling 911 were played for the court, by stipulation and agreement of the parties as to their foundation and as to their admissibility into evidence. After they were played, the State called Douglas Nicoson as its next witness. Nicoson testified that he was working as an officer with the Greenville Police Department on November 16, 2018. He testified that he responded to a dispatch for an unresponsive child, and that at the residence he responded to, his in-car audio and video recording system was working properly and accurately captured what transpired. A recording from that system was admitted into evidence without objection and was played for the court. As it played, the State continued with its questioning of Nicoson. He testified that the defendant—who Nicoson identified in court—could be heard on the recording. He testified that the recording was a fair and accurate depiction of the scene he encountered that morning.

¶ 32 After the recording played, Nicoson testified that the defendant was waiting outside the residence when Nicoson arrived, and that when Nicoson entered it, he saw a child in a onesie on the floor. He testified that the child was not breathing and had no pulse, and that he unbuttoned the onesie to expose the child's chest and began to administer CPR compressions. He testified that before he began, he noticed "a small scratch to the baby's abdomen." He testified that thereafter he asked the defendant some questions, such as when was the "[l]ast time that you saw the child healthy, healthy and breathing," and that the defendant responded "around 3:15 in the morning whenever a female individual that was at the residence at the time went up to go to work." Nicoson added, "I did notice that whenever I was doing the assessment there was some blood and stuff around the nose and mouth area, and I believe I asked him—or told somebody to go see if there was any blood in the crib as well."

16

¶ 33 Deputy John Barnes testified that he was employed by the Bond County Sheriff's Department and had been since 2012. He testified that on November 16, 2018, he was on duty and received a dispatch that involved "an infant that was not breathing." He testified that he arrived at the residence just before Nicoson did, that he saw the defendant standing outside, and that he entered the residence. Of relevance to this appeal, he thereafter testified, with regard to his questioning of the defendant, as follows:

"I just kind of asked him, you know, how did this come about, [he] led us to the bedroom where the baby's crib or bassinet was and his bed that he slept in, they shared that night, that same room. Showed me an empty bassinet, showed me his bed with a pillow on it that had blood stains on the pillow."

¶ 34 Barnes authenticated and described photographs that were taken in the residence. He testified that the defendant told Barnes "that he was awakened by his baby gasping, coughing. He looked over at his—the crib or the bassinet, and that's when he noticed his son lying face up with his head turned to the side with blood coming out of his mouth and noticed that he wasn't breathing." He further testified that the defendant told Barnes that the defendant "removed his baby from the bassinet, turned him over on his stomach on the pillow, and tried to pat him on the back or dislodge whatever, seeing if he could dislodge or get him to start breathing."

¶ 35 Barnes testified that later, when he was at the hospital, a nurse approached him because she "was concerned about some bruises or markings on the child." Barnes testified that he then spoke with the defendant again, and that the defendant stated that he did not know anything about the bruises or markings. After Barnes asked the defendant if the defendant was sure, the defendant told Barnes "that he was giving his baby a bath that evening, the night before, and the baby slipped out of his hands, and he caught him on his knee, and I asked if that was, you know, anything to be alarmed of, concerned of." He testified that the defendant did not appear to have any concerns, and

17

that "[t]he baby didn't show any signs of, you know, difficulty breathing or head trauma or anything like that at that time as far as [the defendant] was concerned." He testified that when he asked the defendant if there were "any other incidents" Barnes should be aware of, the defendant told him, " 'No *** not at all.' " On cross-examination, Barnes agreed that it was possible that performing CPR on an infant could cause bruising to the infant.

¶ 36    Emily Gaffner testified that in November 2018, she was employed as an emergency medical technician (EMT) basic and as an emergency room (ER) technician. She testified that she was part of an ambulance crew that responded to a call for an unresponsive infant on November 16, 2018. She testified that when the ambulance arrived at the residence, she and her partner, Jerry Naylor, entered the residence and observed a police officer on the floor "doing compressions on an infant." She testified that the infant was "pale and blue" when she, Naylor, and the officer took him to the ambulance. She added that the infant "appeared to be lifeless." Of relevance to this appeal, she thereafter testified that she also noticed "dried blood on the mouth and nose" of the infant, and that Naylor told her that when Naylor attempted to intubate the infant, Naylor observed "bright blood at the back of the infant's throat," which made it difficult for Naylor to intubate him.

¶ 37    Mathew Ostendorf testified that he was a registered nurse at the hospital in Greenville, and that on November 16, 2018, he was working as an ER nurse when an infant was brought in who was unable to breathe on its own. Ostendorf testified that he observed the infant, and that he recalled seeing blood in the infant's nose, but not in its mouth. He testified that he also "noticed that there was some bruising on its abdomen." He testified that "maybe an hour later, the infant started to become a little bit more responsive," at which point he "was assessing the signs" because he "wanted to see if its pupils were even." He testified that "[i]f that's the case, then you're thinking maybe there's something, you know, traumatic with the brain." He added, "I noticed it was rag-dolling," which he explained meant "[w]hen its eyes roll to the back of its head." He testified that

18

he observed this, but did not "really know what it indicates or means." He testified that he believed that, "based upon the condition of the infant," DCFS was contacted, although he did not make that contact. He clarified that although he did not make the call, he knew that it was done.

¶ 38 At the outset of the third day of the defendant's bench trial, after some preliminary matters not relevant to this appeal were discussed, the State called John Bowman as a witness. Bowman testified that he was employed by DCFS, and that he had been for 17 years. He testified that on November 16, 2018, he was assigned to investigate allegations of abuse related to Evander. He testified that he traveled to St. Louis Children's Hospital, arriving at approximately 4:30 p.m. that day, and that once he arrived, he was taken to the pediatric intensive care unit, where he met with social worker Kelly Patton, who told Bowman "that Evander had extensive head injuries." He authenticated and described photographs that he took of Evander that afternoon at the hospital, which were subsequently admitted into evidence.

¶ 39 Bowman testified that he spoke privately with Morgan, who was "cooperative." Bowman authenticated and described photographs that he took of Morgan's phone, as well as of text messages on that phone that Morgan indicated were between her and the defendant. These photographs too were subsequently admitted into evidence. Bowman testified that following his conversation with Morgan, he did not have any concerns about her.

¶ 40 Bowman testified that he then spoke privately with the defendant, who he identified in court. He testified that once he told the defendant why he was there to talk to him, the defendant "immediately told me that Evander—that Evander had a mark on his belly because he had pushed off of [the defendant's] lap that evening after [the defendant] had given him a bath." He testified that the defendant told him that the bath incident happened at approximately 6 p.m. the night before, and that Evander did not cry when it happened. Bowman testified that the defendant "specifically" told Bowman that Evander "did not show any signs of discomfort" and was not

"fussy" afterwards. When asked if the defendant stated that Evander hit his head, Bowman testified as follows:

> "No. He actually told me that he was able to save Evander from striking the floor because he was able to grab him. He explained to me Evander was on his lap, on [the defendant's] lap, and he was drying him off with a towel after giving him a bath, and Evander had pushed to kick off of him, so [the defendant] was able to grab him and believes the mark on his stomach was from [the defendant's] thumb."

¶ 41 Bowman testified that he did not believe the mark on Evander's stomach looked like it was from a thumb. He testified that to him "it was a more lateral abrasion." He testified that the defendant told him that Evander behaved normally throughout the evening during his regular routine. Bowman testified that the defendant told him that a woman named Toni Tongay, who was also staying at the residence, returned home at about 7:30 p.m., spent time with the defendant and Evander, then went to bed, because she had to work at approximately 3:30 a.m. the following morning. Bowman testified that the defendant told him that Evander went to bed peacefully, the defendant went to bed after that, and that the defendant woke up at approximately 3:30 a.m., checked on Evander—who was fine—then went back to sleep.

¶ 42 Bowman testified that the defendant told him that the defendant woke up again at approximately 5 or 5:15 a.m. to hear "that Evander was gasping for air." He testified that the defendant told him that he could see Evander's face, and that he picked Evander up, then laid him on the bed. He testified that the defendant "report[ed] seeing blood on his mouth that he said got onto the pillow and that he started doing CPR on Evander before calling 911 and then calling Ms. Campbell." Bowman testified that the defendant did not tell Bowman that he "shook" Evander or "anything else" other than what Bowman described. He testified that the defendant told him that one of the doctors had told the defendant "that this could have occurred any time within the last

20

three days due to a lack of oxygen." Bowman continued, "I asked him if he had any suspicion that someone caused the injuries to Evander, and he told me he had no suspicion of that happening." He testified that he found the defendant's statement to be an "unusual" one, "because the presenting problem that he brought to the table was the injury to his stomach and that being the only injury that [the defendant] came forward knowing about or being concerned about." On cross-examination, Bowman reiterated that the defendant clearly told him that Evander did not hit his head on the floor when he slipped from the defendant's grip after the bath. He reiterated the same point on redirect examination. He also reiterated that the defendant told him very clearly that Toni Tongay did not, at any point, have unsupervised contact with Evander.

¶ 43    Joshua Easton testified that he was a crime scene sergeant with the Illinois State Police, had been with the Illinois State Police for 15 years, and investigated the residence of the defendant and Evander on November 16, 2018. He authenticated and described photographs he took at the scene that day. He testified that he also attended Evander's autopsy in St. Louis, on November 19, 2018, and that he believed the autopsy proceeded according to normal protocols.

¶ 44    Scott Workman testified that he was the chief of the Greenville Police Department. He testified that in November 2018, he was a sergeant with the department. He testified that on the afternoon of November 18, 2018, he, along with Johnny Runyon, who at that time was the chief of the department, attempted to interview the defendant, but an interview did not happen. Workman testified that the defendant was under arrest at that time, and was returned to his holding cell following the unsuccessful interview attempt. He testified that approximately one hour later, he received "communications" from the jail and an interview then occurred. He testified that the entire interview was recorded. He testified that prior to the interview, he had obtained phone records related to the defendant's phone.

21

¶ 45    Johnny Runyon testified that in November 2018, he was the chief of the Greenville Police Department. He testified that he was present for the interview of the defendant in this case. The recording of the interview was then played, in part, for the court. The parties agreed that after a lunch break, some of the State's medical witnesses would testify, then the remainder of the recorded interview would be played, with Runyon recalled to the stand for that. Following the playing of the first, approximately, 17 minutes of the recorded interview, and following the lunch break, Dr. Robert G. Einhorn testified that he was a pediatrician who practiced primarily in Vandalia, and had been a pediatrician for 40 years. He was qualified, without objection, as an expert in pediatrics. Dr. Einhorn testified that he was Evander's pediatrician and saw him two times during Evander's life for "well-child visits." He testified that he saw Evander on September 27, 2018, and that he had "no concerns" about Evander at that time. He testified that he also saw Evander on October 11, 2018, and again had no concerns. He agreed that Evander was a happy and healthy baby.

¶ 46    Dr. Kathy Swafford testified that she was a general pediatrician and a child abuse pediatrician. She testified that DCFS asked her to review Evander's medical records as part of this case. She testified that she rendered a report and an opinion letter. She testified that in this case, she was asked if her "findings were consistent with the opinion of the doctors in St. Louis of a head injury that caused the death." She testified that she did not find any evidence in this case that Evander died of SIDS because "[t]he classic presentation of SIDS is we find them dead. We don't hear them gasping, we don't hear them restless in their bed or struggling to free themselves from coverings." With regard to her opinion as to what caused Evander's death, Dr. Swafford testified that "[a]ll of the information that was provided to me indicates that he sustained significant head trauma. I have no accident to explain this; therefore, it falls under what we would consider to be

22

nonaccidental." She added, "The letter did not ask me to make an opinion, and so I only said he died of a head injury."

¶ 47    Dr. Swafford testified that none of the explanations that were provided as to how Evander was injured "should be enough of a fall that I would expect to see the types of injuries that we saw in this child, that degree of head injury to produce the bleeding in the skull and the bleeding that we saw in the eyes on autopsy and to cause such brain injury that he died from these injuries." When asked if she believed Evander was injured when he went to bed that night, Dr. Swafford testified as follows:

> "The current literature in pediatric or child abuse and the opinion, I think, of the majority of the doctors who practice child abuse, whether they're neurologists or neurosurgeons or child abuse pediatricians, especially for infants who sustain this degree of head injury, is that they become symptomatic almost immediately, maybe a few minutes to an hour, but it's not hours. So I can't imagine that this child had an injury before the evening and then presented in this degree of distress [at] 5 a.m., some 12 hours later."

Thereafter, Dr. Swafford testified that she believed Evander was injured shortly before the 911 call was placed.

¶ 48    On cross-examination, with regard to whether Evander could have suffered his injuries by hitting his head on the floor after he fell after his bath, Dr. Swafford testified that according to medical literature "the likelihood of death from a fall of less than 10 feet was .48 percent per 100,000. So can I say never, no; but the likelihood is extremely low." She added, "I would have expected to see probably a red mark on his head much like what we saw on his abdomen if he hit hard enough that we're going to postulate that that fall to the floor was the cause of the bleeding." She also testified that there was "almost never a subdural bleed" in cases that involved a "delayed presentation for a head injury." On redirect examination, Dr. Swafford was asked if ever, in her 33

23

years of practice, she had had a situation where a parent could not remember if a baby that had fallen had hit its head or not. She answered, "No, not unless they weren't in the room."

¶ 49    Following Dr. Swafford's testimony, Chief Runyon again took the stand, and the remainder of the defendant's interview with the police was played for the court. Thereafter, by agreement of the parties, a video recording of a separate "reenactment" by the defendant, for the Greenville police, was played for the court. The contents of these recordings are described as necessary below. After Chief Runyon was excused, the parties read into the record a stipulation regarding the testimony of Jerry Naylor, who was ill with COVID-19 and could not testify in person, that he was a licensed paramedic on the ambulance crew that transported Evander from the residence to the hospital in Greenville, and that, *inter alia*, (1) he heard the defendant state that "he had checked on the baby about an hour ago and the baby was fine; but when he just checked on the baby, it was not breathing, and there was a small amount of blood on the baby pillow"; (2) in the ambulance, Naylor removed the baby's sleeper, at which time he "noticed a long, thin line which appeared to look like a red mark on the lower, right abdomen of the baby"; and (3) "there was a small amount of bright blood in the back of the [baby's] throat."

¶ 50    The following morning, after the discussion by the trial judge and the parties of matters not relevant to this appeal, Dr. Dee Hodge III testified that he was an emergency pediatrician at St. Louis Children's Hospital and a professor of pediatrics at Washington University in St. Louis. Following further testimony about his qualifications, he was qualified, without objection, as an expert in pediatric emergency medicine. Dr. Hodge testified that he examined Evander at the hospital on November 16, 2018, and that in his professional opinion, Evander "had severe head injury." He testified as to his observations about, and treatment of, Evander. He subsequently testified that one would not "see injuries consistent with head trauma in a SIDS death."

24

¶ 51    Dr. Manu Goyal testified that she was a neuroradiologist at Washington University in St. Louis. Following further testimony about her qualifications, she was qualified, without objection, as an expert in neuroradiology. Dr. Goyal testified that on November 16, 2018, she was called upon to review "a CT scan of the head and CT scan of the neck, the cervical spine," of Evander. She testified that "[t]here were three major findings," with the first being "areas of blood inside the skull," the second being "swelling of the brain," and the third being an absence of fractures. She testified that her diagnosis based upon these findings was "head trauma." She thereafter testified that "[t]he absence of fracture and the clinical history with the severity of bleeding both in the—potentially in the back of the eyes but also around the brain was highly concerning for abusive head trauma." On cross-examination, Dr. Goyal agreed that the density of blood seen in the CT scans indicated that the trauma occurred "recently," which could mean "within hours or days."

¶ 52    Dr. Adrienne Atzemis testified that she was a child abuse pediatrician. Following further testimony about her qualifications, she was qualified, without objection, as an expert on pediatric child abuse trauma. Dr. Atzemis testified that on November 16, 2018, she became involved with Evander's case, shortly after he arrived at St. Louis Children's Hospital. She testified that prior to Evander being taken into surgery, she took short medical histories from the defendant and from Morgan. She testified that thereafter, she took individual histories, beginning with Morgan, then the defendant.

¶ 53    Dr. Atzemis testified that the defendant told her the following:

"That he did give him a bath. That he didn't see or notice anything abnormal about Evander during that bath. That when he was drying him he had a towel on his lap, Evander was placed onto his lap face up, his head away from him, his feet towards him. That I believe that he reached for something, made some kind of movement, and at the same time he said

Evander kicked his legs and that movement caused Evander to slip and that slip forward down his legs and that he used his hands to stop him from falling and then pulled him back up."

¶ 54 Dr. Atzemis added:

"I asked in different ways and many different times if there—if Evander hit his head in that process, because that would be very important in our evaluation for potential accidental injury, and every time he said no, that he caught Evander, he stopped it, he did not hit the floor with any part of his body and definitely did not hit his head on the ground."

¶ 55 Dr. Atzemis testified that the defendant described Evander as "well" after the incident, with the rest of the evening proceeding normally. She testified that the defendant told her that the defendant checked on Evander at approximately 3 a.m., and that Evander seemed fine. She testified that the defendant told her that at approximately 5 a.m., the defendant woke up and that Evander "gasped and his chest went in and he picked him up and saw that he was limp and he wasn't breathing." She testified that the defendant described "resuscitative measures" that the defendant attempted. She continued:

"So he described—he described he used the word shaking him, and I had him show me what he meant by that, because obviously that would be very important in my assessment of a shaking event. So he demonstrated to me holding Evander by the body and essentially jostling him—you know, like going back and forth is how he showed me, (indicating.) That he was calling out to Evander, that he was saying 'come on, Evander' and trying to get his attention, but that didn't work. He described putting him on his back—or down on his belly on the bed and doing, like, back blows, because he didn't know if he was choking on something so that he did that to—if there was some choking, wasn't sure. He put him back—turned him back around. He saw blood on the pillow, and then he started CPR. I

26

asked how he did CPR, because untrained people do CPR in different ways. He described using two fingers of both of his hands and pressing on his chest. He described doing chest compressions, ten to 15, and then doing some breaths into Evander's mouth. He said he did that for a short amount of time and then found his phone to call 911 and called emergency services and that they—and he continued the CPR until the emergency services arrived, which he described as a very short time after he called."

¶ 56    Dr. Atzemis testified that she formed her diagnosis after speaking with Morgan and the defendant and examining all of the medical evidence that was available to her, including the CT films and as much of a physical examination as she could do of Evander in his "very, very poor" condition. She testified:

"So I had information to tell me that Evander was overall a healthy child and he did not have any medical problems, no evidence, signs, or symptoms reported to me of any medical conditions the day prior to his death or to his presentation, that he presented with apnea, which is not breathing. That was his presentation. That is relevant to me, because that is a presentation of apnea without any other indication is concerning for inflicted trauma."

¶ 57    Dr. Atzemis further testified that:

"the initial medical care done at the first hospital clearly documents and I know that there was others like the picture shown to me that he had a bruise on his abdomen. It was a linear bruise. Wasn't a scratch. It was a bruise with abrasion. The presence of that bruise was concerning to me. Evander was two months old, does not participate and do things that would lead to himself causing accidental trauma to cause a bruise."

¶ 58    Dr. Atzemis thereafter testified that:

"The history of the very—what was described to me as a very minor slip down the legs and a catch did not—was not consistent with such an injury to the abdomen. Injuries to the

abdomen generally take significant force, because there is no bony prominences. It's a soft part of the body that the force would have to be high and what was described was not. So the presence of that linear bruise was concerning to me."

¶ 59 She added that "[t]ypically linear bruises are caused by impact with a linear object. It can be other things, but that is the primary concern." She testified that based upon the location of the subdural hematoma that Evander had, as well as the brain swelling and other medical evidence and histories, her preliminary opinion was that the cause of Evander's injuries "was most likely abusive head trauma." She testified that after Evander died, and an autopsy was performed, she reviewed the results of the autopsy. She testified that after she reviewed those results—which she described in detail—she formulated her final opinion as to the cause of Evander's injuries, which was "[t]hat Evander was the victim of an abusive head trauma." When asked if she formulated an opinion with regard to when his injuries were inflicted, she testified, *inter alia*, "[t]hat the brain injury had to have occurred very shortly in time sequence, meaning that the brain injury was severe enough that led to his death and that brain injury would lead to a rapid progression of symptoms leading to ultimately his comatose state." She added, "So it would be a very rapid progression to a symptom, not death but to symptom." She testified that it could not have occurred prior to Evander being put to bed, based upon the defendant's description of how Evander was acting at that time. Dr. Atzemis testified that under medical literature, a "short fall"—defined as one of less than three feet—could not have caused the "totality" of Evander's injuries. She testified that she viewed the video of the reenactment by the defendant, and she did not believe that the defendant's actions, as depicted in the video, could have caused Evander's injuries.

¶ 60 On cross-examination, Dr. Atzemis agreed that she did not know the "mechanisms" or specific events that caused Evander's injuries. She testified that even if she were to suppose that Evander did actually hit his head when he fell off of the defendant's lap, based upon the rest of the

28

history from the defendant—that, in essence, Evander was fine after that—she did not believe his injuries could have resulted from the fall. She testified that she did not agree with Dr. Scheller that Evander's case could be "an episode of SIDS that was caught just before the child died." She testified that it was "well established in the medical literature" that such an occurrence was not consistent with what happened in this case. On redirect examination, Dr. Atzemis testified that with regard to "mechanism," her opinion was that "there was a rotational acceleration/deceleration event with or without an impact."

¶ 61 Dr. Erin Ely testified that she was an assistant medical examiner for the city of St. Louis. Following further testimony about her qualifications, she was qualified, without objection, as an expert in pathology. She testified that on November 19, 2018, she performed the autopsy on Evander. She testified as to the procedures she followed, and what she observed, during the autopsy. She testified that based upon her external and internal examinations of Evander's body, as well as her training and experience, she believed that it was "likely less than 12 hours" before the onset of Evander's symptoms that his injuries occurred. She testified that her opinion was that the cause of Evander's death was "closed head injury" caused by "significant rotational acceleration and deceleration of the head" which could have been caused by someone shaking or striking Evander.

¶ 62 The next morning, Dr. Michael M. Bond testified that he was vice chief of the medical staff and an emergency room physician at the hospital in Greenville. He was qualified, without objection, as an expert in emergency room services. He testified that on November 16, 2018, he examined Evander when he was brought by ambulance to the hospital. Dr. Bond testified that other than "a bruise, red mark on the abdomen," he did not observe "any obvious signs upon Evander." He testified that his focus at that time was to determine why Evander was not breathing properly. He testified that it became "clear that we needed to send him to a higher level of care for further

diagnostic testing and evaluation by specialists," which is why Evander was transferred to St. Louis Children's Hospital. He testified: "I was pretty convinced there was something going on in the head, the brain area, primarily because of the respiratory depression. There's not really—what causes that in an infant is usually due to something going on in the brain as well as the low temperature." He thereafter added, "the concern was it could be due to a trauma to the brain, it could be due to a brain tumor, but I was pretty confident that there was some type of head problem causing his current symptoms."

¶ 63     Dr. Mark Shuman was thereafter called as an out-of-order witness for the defense. Dr. Shuman testified that he was a forensic pathologist who lived in Florida and worked as a medical examiner there. Following further testimony about his qualifications, he was qualified, without objection, as an expert in forensic pathology. Dr. Shuman testified that with regard to this case, he authored a report on May 4, 2020. He testified that he reviewed Evander's medical records (including microscopic slides provided to him by the St. Louis City Medical Examiner's Office), histories, and the autopsy report. Dr. Shuman testified that in his opinion, Evander died of "[b]lunt head injury." He testified that he believed Evander's "head likely hit the ground" when he fell from the defendant's lap after his bath, and that this "would have caused all the findings." He testified that he believed this could be true even if Evander was acting normal after the fall, and even if it was a short fall of less than two feet. He testified that he had watched the "reenactment" video, and did not believe that the actions the defendant described and demonstrated taking when he found Evander unresponsive the following morning could have caused Evander's injuries. He testified that he did not believe this was a case of "shaken baby syndrome." Dr. Shuman testified that if Evander did not hit his head when he fell from the defendant's lap, "at some point his head was hit. That's what caused this." Dr. Shuman testified that he had reviewed Dr. Case's report in

30

this case, and that he disagreed with her conclusions in this case, and with her methodology and protocols.

¶ 64 On cross-examination, Dr. Shuman testified that although he agreed that inflicted head trauma injury exists, he did not agree with all of the diagnostic criteria related thereto, and did not agree "with shaking as a mechanism of the cause of primary brain injury." He agreed that it was not clear from the evidence that Evander's head hit the floor, which is why he prefaced his opinion by noting that it was based on "if" Evander's head hit the floor. He thereafter testified, "I agree that short-fall deaths are rare, but you cannot apply statistics to individuals. If it happen[ed] here, it happened." He subsequently added, "It doesn't happen often, but it happens." He thereafter testified that he did not have any criticism of the autopsy procedures or methods in this case, other than Dr. Eli's ultimate opinion. When asked to define "the difference between a blunt head injury and abusive head trauma," Dr. Shuman testified, "Blunt head injury can be caused by somebody else or it can be caused by accident. Abusive head trauma is, by definition, inflicted trauma." He testified that he agreed "that this is not a SIDS death, SIDS episode." He further agreed that "[i]f, in fact, Evander Hickman never hit the floor," it was his "medical opinion that there was some other traumatic injury to his brain that caused the problem." He added, "He was struck on top of his head or his head struck something on top of his head."

¶ 65 Following Dr. Shuman's testimony for the defense, the State returned to its case. After ensuring that all exhibits had been admitted, the State rested. The defendant moved for a directed verdict and dismissal of the charges, contending there was not sufficient evidence to convict the defendant of either of the two counts with which he was charged. The motion was denied. The defense proceeded with its case.

¶ 66 Toni R. Tongay testified that she lived in Greenville, had a three-year-old daughter, and had voluntarily relinquished her rights to her daughter because of "allegations of [Toni's] use of

illegal drugs." She testified as to previous convictions related to drug charges, and testified that she had successfully completed a drug rehabilitation program. Toni testified that in November 2018, because her roommate had not paid the power bill at her previous residence, there was no power there, and the defendant allowed her to stay at his house. She testified that at the time in question, Evander "seemed fine." She testified that she was not present when Evander had his bath, but was present later in the evening, and that Evander again "seemed fine" when she helped put him to bed. She testified that she slept in the spare bedroom, not the room with Evander and the defendant, and that she woke up when her phone alarm went off at 3 a.m. She testified that she got ready and left by 3:15 a.m. to walk to work. She testified that she did not see or hear the defendant or Evander during that time. Toni testified that she was interviewed by the police at her place of work at approximately 6:30 a.m., and that after she finished work for the day, she went to the police department and gave an official statement.

¶ 67    On cross-examination, Toni agreed that when she was interviewed by the police, she did not know what had occurred with Evander, but that she "cooperated 100 percent" with the investigation. She agreed that during his two-month lifetime, Evander appeared to be a happy and healthy baby. She agreed that when the defendant told her about Evander falling after his bath, the defendant told her that he "[c]aught him before he hit the ground." She testified that she was sure that was what the defendant told her.

¶ 68    Doug Schaufelberger testified that he was the defendant's step-grandfather. He testified that he had known the defendant for the defendant's entire life. He testified that the defendant had been very helpful around Doug's farm. When asked to describe the defendant's manner, he testified that the defendant "had his moments, but he's pretty easygoing." He testified as to the defendant's criminal record, describing the defendant's conviction for escape from the Bond

County jail as "[a] dumb kid mistake" that happened when the defendant was "[e]ighteen, 19, somewhere in that range."

¶ 69    Doug testified that Evander was "pretty content, pretty normal." He testified that after Evander died, as Doug was returning from the hospital in St. Louis to Greenville with his wife and the defendant and Morgan, he was informed that there were a lot of police officers in the area of the home, so they went to the home of a friend of his. He testified that because Morgan and the defendant had raised concerns about information about marijuana being on their phones, Doug suggested that they leave their phones at the home of his friend. He testified that they did so. He testified that as they proceeded home, they stopped at a local cemetery, to look for a burial plot for Evander, and that the police met them at the cemetery and asked the defendant and Morgan to come to the police department to answer some questions. He testified that subsequently, Morgan was released and the defendant was charged with the murder of Evander. Following his testimony, the defense rested for the day, while reserving the right to call the defendant to testify when the bench trial resumed.

¶ 70    Ultimately, the defendant chose not to testify, after which the defense rested its case. In rebuttal, the State called Dr. Mary Case. She testified that she was a pathologist employed as the chief medical examiner of St. Louis County. After further testimony about her qualifications, she was qualified, without objection, as an expert in the areas of neuropathology, anatomic pathology, and forensic pathology. Dr. Case testified that with regard to this case, she reviewed Evander's medical records, photographs, autopsy report and microscopic slides from the autopsy, and the police reports and recorded interviews. She testified in general about differences in the anatomy of adults and of children and infants. Dr. Case testified as to what the medical literature indicated about short falls of less than five feet, as well as the types of injuries expected in such situations. She testified that Evander had no evidence of a skull fracture or an epidural hemorrhage. She

testified that based upon the medical findings in Evander's case, her opinion as to Evander's cause of death was that it was "a closed head injury." She added:

"Meaning that there is no skull fracture. That's just a category and then within that closed head, he has subdural and subarachnoid hemorrhage. He has bilateral extensive retinal hemorrhages and he has traumatic axonal injury. So those are parts of that head injury and they all help us to understand certain aspects of the injuries such as when did this injury occur and how did it cause him to die."

¶ 71    Dr. Case testified that in this case there was no "indication of a SIDS incident," and no "indication of a blood clotting incident." She testified that she viewed the "reenactment" video and that there was nothing in it that would explain Evander's injuries. She testified that based upon the severity of Evander's injuries, she believed they must have happened between the time he was put to bed and the time the injuries were reported, at approximately 5 a.m. She testified that the noticeable effects of the injury would have been "immediate." She testified that even if Evander fell after his bath as the defendant stated he did, it would not have caused Evander's injuries, which were the result of "a very violent movement one or more times of the head either by impact or by something that has caused the head to violently move."

¶ 72    On cross-examination, Dr. Case agreed that she did not know the "mechanism" that caused the impact on Evander's head. She further agreed that the microscopic slides that were provided to her in this case did not include the corpus collosum, which she had indicated in a previous scholarly article she had written was necessary to properly evaluate axon damage. On redirect examination, Dr. Case testified that she disagreed with conclusions stated in a scholarly article written in part by Dr. Shuman, because she believed the article was flawed in numerous ways and was "an embarrassment to the peer review process." She further testified that despite not having

34

the corpus collosum slide, she had enough tissue to make her diagnosis. Following her testimony, the State again rested.

¶ 73 In closing argument, the State devoted the majority of its time to reviewing the evidence that it believed proved the defendant's guilt beyond a reasonable doubt. The State discussed in detail the evidence adduced at trial from the various doctors who testified for the State, described above, including Dr. Case. Thereafter, the State described the evidence related to the defendant's explanations of what happened to Evander, and pointed out why it did not believe the defendant's explanations were credible. The State then discussed the evidence presented by the doctors who testified for the defense. Near the end of its closing, the State argued, "We all agree that nothing is shown in the defendant's statement or the courtroom tells how Evander was injured so very badly that morning. It is only known by Evander and his killer and that killer is the defendant."

¶ 74 Thereafter, defense counsel provided lengthy argument in support of his position that, in light of the conflicting evidence that had been adduced at trial, adequate evidence had not been produced to prove the defendant guilty beyond a reasonable doubt of the charges against him. In its rebuttal argument, the State again pointed out what it considered to be the inadequacies of the defendant's explanations of what happened, and again touched upon the medical evidence, including the testimony of Dr. Case. The trial judge then took the matter under advisement.

¶ 75 In a written order filed four days later, on August 7, 2020, the trial judge found the defendant guilty of both counts with which he was charged. The order did not discuss the trial judge's reasoning. The trial judge did not discuss his reasoning when orally announcing his verdict that day either. On August 17, 2020, the defendant filed a motion for a new trial or alternative relief, in which he contended that there was not sufficient evidence presented at his trial to support his convictions. He did not challenge the State's closing arguments.

¶ 76    A hearing on the motion was held on September 8, 2020. After hearing the arguments of the parties, the trial judge stated, *inter alia*, the following:

"So this is not a new or novel set of circumstances what is present in this case, and much has been said by the defendant in closing arguments and again here today that the State cannot meet its burden because they cannot prove precisely what occurred, but they don't have to. This is—as I said, it's not a new or novel set of circumstances where a parent or an individual is left alone and the sole caregiver for an infant and that infant ends up with horrific injuries and dies. Under those circumstances—and it's not unlike many murders, precisely what happened and how it happened in the absence of there being a video camera or a confession, most times we never know. *** I did not believe the defendant's experts. I did not find them to be credible. So we're left with the defendant being alone with a two-month-old. Now, what happened? We could conjecture and speculate all day. Was he crying? Did the defendant pick him up and violently shake him? Did he pick him up and throw him across the room? Did he shake him and then throw him across the room? We're never going to know exactly what happened. But in my verdict, I found that something did happen, and the only person who could have been responsible for that is the defendant. *** The statements he made to the police were not truthful."

¶ 77    The trial judge thereafter denied the defendant's posttrial motion. The defendant's sentencing hearing followed immediately thereafter. The trial judge determined that counts I and II merged for purposes of conviction and sentencing. Therefore, judgment of conviction was entered only on count I. Ultimately, the defendant was sentenced to 38 years in prison on count I, to be served at 100% and to be followed by 3 years of mandatory supervised release. This timely appeal followed. Additional facts will be provided as necessary below.

36

¶ 78                                    II. ANALYSIS

¶ 79    On appeal, the defendant first contends that the evidence adduced at his bench trial was not sufficient to sustain his first degree murder conviction. When a defendant makes such a claim, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. See, *e.g.*, *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id.* There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id*. at 416-17. We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact. *Id*. at 416. "Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant." *Id.* at 417. It is axiomatic that "[a] defendant can be convicted solely on circumstantial evidence," and that "[t]he trier of fact does not have to be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence." *Id*. It is also axiomatic that "[t]he standard for reviewing the sufficiency of the evidence in a bench trial is the same as it is in a jury trial." *People v. Howery*, 178 Ill. 2d 1, 38 (1997).

¶ 80    In this case, the defendant posits that at the defendant's bench trial, "there was no evidence, or even any argument, about what act [the defendant] supposedly committed," and no "evidence

or argument that the undefined act [was] done with any particular state of mind." He further posits that "the conclusions of the medical witnesses were not sufficiently strong as to satisfy the 'beyond a reasonable doubt' standard." In particular, the defendant contends, *inter alia*, that law review articles have called into question medical testimony such as that found in this case, and that in light of that, the conclusions rendered by medical experts in this case "were largely weak, imprecise, [and] standard-less." He contends that no witness in this case testified with adequate precision that the defendant committed first degree murder, and that there was no testimony with regard to the "*actus reus*" in this case, or with regard to the "*mens rea*" in this case. He points to circumstantial evidence that he claims makes it unlikely that the defendant would have killed Evander.

¶ 81    In its brief on appeal with regard to this issue, the State counters that in cases such as this one, circumstantial—rather than direct—evidence of guilt is quite common, and correctly notes well-established case law standing for the propositions that (1) a trial judge is not obligated to believe defense medical experts over prosecution ones (see, *e.g.*, *People v. Dresher*, 364 Ill. App. 3d 847, 855-56 (2006)), and (2) conflicting expert medical testimony does not, alone, create a reasonable doubt as to a defendant's guilt. See, *e.g.*, *People v. Platter*, 89 Ill. App. 3d 803, 816-17 (1980). The State recounts, *inter alia*, the key factual evidence in this case, which the State claims shows that Evander "was apparently in excellent health" prior to his death. The State posits that the defendant's arguments on appeal fail because "the evidentiary record conclusively establishes that the defendant intentionally struck and/or shook [Evander] in a sufficiently violent fashion to cause massive brain injuries and death." The State further posits that "[t]he defendant's explanation about what happened could not account for why Evander suffered such severe injuries," and that "[t]he defendant's two expert witnesses offered contradictory theories as to what may have caused Evander's death."

¶ 82    In his reply brief, the defendant argues, *inter alia*, that in this case the defendant "did not confess, and there were obviously no eyewitness accounts as to what happened, or didn't happen, to the child," and that "[a]s a result, there is no reliable evidence as to what occurred to this child, no act proven, and no state of mind as well." The defendant further contends "that the issue of the timing of when a child's injuries may have occurred is vital in cases of this nature," and that in this case, "the opinions of the experts ranged significantly as to the issue of when the injury occurred," which means "that the various opinions were enveloped in uncertainty." The defendant states as well that "in regard to the [S]tate's reliance in its brief on the medical witnesses here, [the defendant] respectfully urges this Court to consider the bigger picture of 'shaken baby syndrome' and/or 'abusive head trauma' convictions," which the defendant again claims have been called into question by new research. The defendant adds that a recent article claims that in the last 33 years, 26 people have been "exonerated" in cases such as this one.

¶ 83    As explained above, when reviewing a claim such as that made by the defendant in this appeal, this court allows all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial, and will not disregard such reasonable inferences that flow from the evidence. See, *e.g.*, *Saxon*, 374 Ill. App. 3d at 416-17. Moreover, we (1) do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact, and (2) will not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt (see *id.*), both of which are exactly what the defendant asks us to do in this appeal.

¶ 84    The evidence before the trial judge in the defendant's bench trial is described in voluminous detail above, and speaks for itself. When viewed in the light most favorable to the prosecution, that evidence was sufficient, beyond a reasonable doubt, to sustain the conviction on

39

appeal. The defendant does not provide any argument or citation to authority in support of the proposition that any of the evidence about which he now complains was not properly admitted, and our review of the record does not show that the defendant would have prevailed on such an argument, even if he had made one. Instead, he merely asks this court to discount, or fail to consider entirely, some of the evidence that was properly admitted but with which he disagrees: in other words, he asks us to reweigh the evidence and retry the defendant, something this court absolutely, and uncategorically, will not do. See, *e.g.*, *id.*

¶ 85    Applying our proper standard of review, explained above, we conclude that a rational trier of fact easily could have concluded beyond a reasonable doubt from the evidence in this case— which included both medical evidence and lay witness tesitmony—that, some time after putting Evander to bed and before calling 911, the defendant struck or shook Evander with the force necessary to cause the severe injuries that caused Evander's death, and that the defendant did so with the intent/mental state necessary to sustain his conviction for the offense of first degree murder. Thus, we conclude that there is no merit to the defendant's contention that the evidence was not sufficient to sustain the conviction on appeal (see *id.*), and we likewise conclude there are no *mens rea* or *actus reus* problems in this case. See, *e.g.*, *People v. Nepras*, 2020 IL App (2d) 180081, ¶ 22 ("the *mens rea* of a crime is rarely proved with direct evidence and is generally inferred from circumstantial evidence"); see also, *e.g.*, *People v. Stiles*, 334 Ill. App. 3d 953, 956 (2002) (*actus reus* of a crime is the "guilty" or prohibited act) and *Saxon*, 374 Ill. App. 3d at 417 (defendant may be convicted solely on circumstantial evidence; trier of fact does not have to be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence). We note as well that a rational trier of fact easily could have concluded in this case—and the trial judge pointedly stated that he did so conclude—that the defendant's medical witnesses and the defendant himself simply were not credible, thereby eliminating much of the "conflicting" evidence about

which the defendant complains on appeal. For all of these reasons, there is no merit to the defendant's first contention on appeal.

¶ 86    The defendant's second contention on appeal is that, in the alternative, "repeated and highly prejudicial plain error occurred by the prosecution in its closing arguments," which the defendant contends requires this court to reverse his conviction and remand for a new trial. The defendant concedes that the purported errors in the State's closing arguments were not objected to in the trial court, and accordingly are forfeited. However, the defendant asks this court to consider the purported errors under the plain-error rule. He contends that the State erred in its closing arguments because, according to the defendant, the State (1) referred to the defendant's failure to testify and thereby attempted to shift its burden of proof to the defendant, and (2) made improper argument about Dr. Case's testimony in rebuttal.

¶ 87    In response, the State argues that at trial the State "did not improperly comment on the defendant's decision not to testify," because the complained-of comments "were references to statements the defendant had actually made" in an attempt to explain what happened to Evander, rather than "comments on his failure to testify at trial." The State also claims that the evidence against the defendant was overwhelming, not closely balanced, and that accordingly, even if there was error, it is not reviewable under the plain-error rule. With regard to the rebuttal testimony of Dr. Case, the State again contends there was no error. The State argues that in its closing arguments at trial, it did not misstate the evidence given by Dr. Case, because the State's arguments reflected reasonable inferences "given the substance of her testimony," and accordingly constituted "an entirely reasonable conclusion to draw from her testimony." The State reiterates its argument that the evidence against the defendant was overwhelming, not closely balanced, and that accordingly, even if there was error, it is not reviewable under the plain-error rule. In his reply brief, the defendant opts to stand on his opening brief with regard to this issue.

41

¶ 88     We begin our analysis of this issue with the well-established—and dispositive—proposition of law that " '[a]bsent reversible error, there can be no plain error.' " *People v. Burton*, 2012 IL App (2d) 110769, ¶ 15 (quoting *People v. Naylor*, 229 Ill. 2d 584, 602 (2008)). Accordingly, when asked to conduct plain-error review following a criminal conviction, this court will not reach the question of whether the evidence in the case is closely balanced—and thus whether a forfeited claim is reviewable under the first prong of the plain-error rule—unless we have determined first that an error has occurred that would require reversal of a defendant's conviction. *Id.* ¶¶ 14-15. When this court reviews a bench trial, we presume that the trial judge considered only admissible evidence, and relied only upon proper closing argument. *Id.* ¶ 15. Unless the record on appeal affirmatively rebuts these presumptions, any errors related to inadmissible evidence, or to improper closing arguments, are not reversible errors. *Id.* Speculation, without more, is not sufficient to affirmatively rebut the presumptions. See, *e.g.*, *People v. Brumley*, 229 Ill. App. 3d 16, 20 (1992). If the acknowledged errors do not amount to reversible errors, the plain-error rule does not apply, regardless of whether the evidence is closely balanced. *Burton*, 2012 IL App (2d) 110769, ¶ 18.

¶ 89     In this case, even if we were to indulge the defendant and assume, *arguendo*, that the State erred in its closing arguments in the manner asserted by the defendant on appeal, the record on appeal does not affirmatively rebut the presumption that the trial judge relied only upon the proper closing arguments of the State. Indeed, the defendant has not even suggested, let alone demonstrated, any manner in which the record could be construed to affirmatively rebut that presumption. Accordingly, there was no reversible error, and the plain-error rule is not applicable to this case. See *id*. Therefore, there is no merit to the defendant's second contention on appeal either.

¶ 90                                III. CONCLUSION

¶ 91    For the foregoing reasons, we affirm the defendant's conviction and sentence.


¶ 92    Affirmed.